UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
Relator THOMAS E. COLUCCI
        Relator,

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA

- against –

BETH ISRAEL MEDICAL CENTER,
ERNST & YOUNG, LLC, MORT HYMAN,
TOM HAYES, and ROBERT NALDI
        Defendants.
------------------------------------------------------X

JUDGE CHIN

Civil Action No.

06 CV 5033

**COMPLAINT AND
JURY DEMAND**

Date Received: _____

ORIGINAL COMPLAINT
FILED <u>IN CAMERA</u>
SEALED PURSUANT TO
31 U.S.C. § 3730(b)(2)

Relator Thomas E. Colucci, having filed a Disclosure Statement with the Department of Justice as required by 31 U.S.C. § 3730(b)(2), alleges for his complaint as follows:

**INTRODUCTION**

1.      This is an action by *qui tam* Relator Thomas E. Colucci, in the name of the United States Government, to recover damages and penalties arising from false statements or records of Beth Israel Medical Center ("BIMC") regarding filing of Medicare cost reports for BIMC's facilities reimbursement.

2.      BIMC is a large teaching hospital, located in Manhattan, New York. In or about 1985 BIMC acquired Doctor's Hospital, New York, on the Upper East Side of Manhattan, a non-teaching facility with approximately 220 patient beds. Later, approximately in or about 1995 BIMC acquired Kings Highway Hospital, New York ("Kings Highway"), a non-teaching facility with approximately 250 patient beds. (Doctor's Hospital and Kings Highway are collectively referred to as the "Satellite Hospitals.") Shortly after the Doctor's Hospital acquisition and then

increasingly after the Kings Highway acquisition, BIMC began systematically overstating its entitlement to reimbursement from Medicare. The fraud pertaining to Doctor's Hospital occurred from in or around 1986 to in or around 2005 when BIMC sold Doctor's Hospital. The same fraudulent activity pertaining to the Kings Highway facility occurred from in or around 1995 and, on information and belief, continues to the present.

3. The Defendants have, individually and collectively, knowingly misrepresented certain elements of BIMC's Medicare cost reports, and/or conspired to do so, resulting in extensive, intentional over-billing of Medicare, which in turn resulted in hundreds of millions of dollars in overpayments to BIMC over a two decade time period at three hospital locations.

## JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et. seq.*

5. Jurisdiction over this action is conferred upon this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 3130 in that this action arises under the laws of the United States.

6. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), and 31 U.S.C. § 3732(a) because Defendant BIMC resides in and transacts business in this District and many of the facts that form the basis for this Complaint, including the actual billing and acceptance of payments, occurred in this District.

## PARTIES

7. Relator Thomas E. Colucci is a resident of New York and a citizen of the United States. Mr. Colucci brings this civil action for violations of 31 U.S.C. § 3729(a)(1), (a)(2), and (a)(3) for himself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Mr. Colucci was an independent consultant to BIMC performing reviews of financial data from

approximately 1997 to 2002. As such, he has personal knowledge of the events described herein.

8.      BIMC is a not-for-profit 501C-3 corporation, incorporated under the laws of New York. BIMC operates a teaching hospital and other health care facilities in New York City, and maintains its principle place of business in New York, New York. It is one of seven institutions that comprises Continuum Health Partners, Inc. The events relevant to this action transpired primarily at BIMC's First Avenue location in New York, New York.

9.      Defendant Ernst & Young, LLC is one of the "Big Four" accounting firms doing business worldwide, including in the state of New York and in New York City. It is a Foreign Registered Limited Liability Company. During all times relevant to this action, Ersnt & Young have served as outside auditors to BIMC.

10.     Defendant Mort Hyman ("Hyman") is the President and Chairman of the Board of BIMC. On information and belief, Hyman is a citizen of the State of New York residing in New York City.

11.     Defendant Tom Hayes ("Hayes") is the Chief Financial Officer for BIMC. On information and belief, Hayes is a citizen of the State of New York residing in New York City.

12.     Defendant Robert Naldi ("Naldi") was during the relevant time period, the Vice President for finance of BIMC. On information and belief, Naldi is a citizen of the State of New York residing in New York City. (BIMC, Hyman, Hayes and Naldi are collectively referred to as "the Hospital Defendants.")

## FACTUAL ALLEGATIONS

### I. Overview

9. The United States Department of Health and Human Services/Public Services Agency administers the Medicare program for the aged and disabled, established by Title XVIII of the Social Security Act. Part A of the Medicare program provides federal payment for patient institutional care, including *inter alia,* in-patient hospital care.

10. The Center for Medicare and Medicaid Services ("CMS") is the governmental body that is responsible for the administration of the Medicare program.

11. Under the Medicare program, CMS makes payments to hospitals for inpatient and outpatient services after the services are rendered. Medicare enters into provider agreements with hospitals that govern the hospital's participation in the program.

12. Under the Medicare program, services provided to patients are reimbursed based on a system known as Diagnostic Related Groups ("DRG") under the Prospective Payment System ("PPS").

13. To assist in the administration of Medicare, CMS contracts with private non-governmental organizations or "fiscal intermediaries" to, *inter alia,* review and process claims for reimbursement submitted by health care providers, including the claims submitted by the Hospital Defendants.

14. At all times relevant hereto, CMS administered the Medicare program in the Southern District of New York through its fiscal intermediary Empire Medicare Services (hereinafter referred to as "Empire").

15. As a prerequisite to payment by Medicare, CMS requires hospitals to submit a Medicare cost report annually at the conclusion of the hospital's fiscal year. The cost report is

the final claim that a hospital files with the fiscal intermediary identifying its costs for services rendered to Medicare beneficiaries and stating the amount of reimbursement to which the hospital believes it is due for the year.

16.     Medicare relies upon the cost report to determine whether the hospital is entitled to additional reimbursement beyond the interim payments that the hospital received from Medicare during the course of the year, or whether the hospital was overpaid by Medicare, and therefore must reimburse Medicare for the excess amounts paid under the program during the course of the year.

17.     Every Medicare cost report contains a "Certification" that must be signed by the chief administrator of the hospital or a responsible designee of the administrator. The Medicare cost report certification page includes the following notice:

> Misrepresentation or falsification of any information contained in this Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Futhermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

18.     The responsible hospital official is required to certify, in pertinent part, that:

> to the best of my knowledge and belief, [the cost report and the balance sheet and the statement of revenues and expenses] is true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

19.     Thus, the hospital must certify that the Medicare cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the hospital is entitled to reimbursement for the reported costs; (3) complete, *i.e.*, that the cost report

is based upon all cost information known to the hospital; and (4) that the services identified in the cost report are billed in compliance with the law.

20.  Furthermore, the hospital has the legal obligation to disclose to Medicare through its fiscal intermediary all known errors and omissions in its claims for Medicare reimbursement, including those costs identified in its costs reports:

> Whoever ... having knowledge of the occurrence of any event affecting (A) [a hospital's] initial or continued right to any such benefit or payment ... conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in greater amount or quantity than is due or when non such benefit or payment is authorized ... shall in the case of such a ... concealment or failure ... be guilty of a felony...

21.  At all times relevant hereto, the Hospital Defendants were required to – and did – submit BIMC's annual Medicare cost reports to the government through Empire.

22.  At all times relevant hereto, the Hospital Defendants were required to – and did – certify BIMC's annual Medicare cost reports.

## II. BIMC's Fraudulent Conduct

**Hospital Defendants Knowingly Made False Statements to Obtain Medicare Reimbursement for Costs Related to BIMC's Direct Medical Education Expenses and Indirect Medical Expenses**

23.  Each facility that provides services to Medicare patients is assigned a "provider number" which becomes the basis for reimbursement by the fiscal intermediary. Shortly after BIMC's acquisition of each of the Satellite Hospitals, BIMC requested that the fiscal intermediary eliminate the acquired hospital's provider number. With the elimination of their unique provider numbers, the basis for reimbursement to BIMC for Medicare patients discharged from the Satellite Hospitals became BIMC's provider number.

24. A hospital that is classified as a "teaching facility" hospital must maintain an approved Intern and Resident ("I & R") Program which must be approved by the governing bodies of the various medical and/or surgical organizations such as the American College of Surgeons and the American Medical Association.

25. Although BIMC was historically classified as a "teaching facility" and did maintain an approved I & R program, neither Doctor's Hospital nor Kings Highway was classified as a teaching hospital by the Medicare Program prior to the BIMC acquisition because their mission did not include the training of Interns and Residents in an approved I & R program.

26. Under the DRG pricing system which Medicare uses, teaching hospitals are entitled to additional reimbursements unavailable to non-teaching facilities, including certain "add-ons" called Direct Medical Education expenses ("DME"), and Indirect Medical Education expenses ("IME").

### A.   DIRECT MEDICAL EXPENSE FRAUD

27. DME expenses comprise the costs of salaries and other personnel expenses and overhead for the Supervising Physicians, Interns and Residents participating in the Graduate Medical Education program. In order to compute a hospital's DME payment, the fiscal intermediary conducts a comprehensive audit of the direct and overhead costs of the reported Interns, Residents and Supervising Physicians in a hospital's I & R program. The hospital is then assigned a "per resident amount" ("PRA"), based on the data gleaned from the audit, which becomes the basis for DME reimbursements to the hospital in subsequent reporting years.

28. Medicare patients treated at the Satellite Hospitals are treated by House Physicians, whereas at BIMC's main campus, Medicare patients are treated by I & R under the direct supervision of a Suervising Physicians. House Physicians are neither I & R nor

7

Supervising Physicians. At all times subsequent to BIMC's acquisition of the Satellite Hospitals, these House Physician salaries from the Satellite Hospitals were improperly included in Worksheet B of BIMC's cost report for purposes of calculating BIMC's DME charges.

29.  BIMC's DME reimbursement is calculated by multiplying its PRA by the number of I & R, then multiplying this result by the Medicare penetration number. Medicare penetration is the percentage of total inpatients that are Medicare patients, excluding psychiatry and rehabilitation medicine.

30.  Once the Satellite Hospitals' provider numbers were eliminated and their data consolidated into BIMC's provider number, BIMC was paid DME reimbursements for the Medicare patients discharged from the Satellite Hospitals despite the fact those patients were never actually seen by Interns or Residents of BIMC's Graduate Medical Education program. Because no I & R nor Supervising Physicians visited the Satellite Hospital beds, the billing of Medicare for and receipt of DME add-ons for Medicare patients discharged from the Satellite Hospitals is inappropriate and constitutes a fraud on the Government.

### B.    INDIRECT MEDICAL EXPENSE FRAUD

31.  IME reimbursement is based on the indirect costs incurred by a teaching hospital admitting Medicare patients. Teaching hospitals incur more costs per Medicare patient than do non-teaching hospitals because teaching hospitals perform more ancillary tests (radiology tests, laboratory tests, etc.) to train the Interns and Residents. As a result, teaching hospitals are given an IME reimbursement add-on per hospital bed used for Medicare patients.

32.  The IME rate is based on a formula, with the numerator in the formula being the number of I & R and the denominator in the formula being the number of inpatient beds. To determine its IME reimbursement, BIMC applies its consolidated Medicare acuity (including

8

Satellite Hospitals) to the Medicare standardized rate, multiplied by the IME percent, multiplied by number of Medicare discharges, including the discharges from the Satellite Hospitals. Prior to their acquisition by BIMC, neither of the Satellite Hospitals received an IME reimbursement or even had an IME rate since neither hospital had any Interns or Residents and was not eligible to receive teaching facility add-ons.

33.   However, when BIMC acquired the Satellite Hospitals and consolidated their provider numbers into BIMC's provider number, all beds from the Satellite Hospitals were included with BIMC's hospital beds under BIMC's consolidated provider number. On paper, this created the appearance of an increase in total beds that the Interns and Residents were involved in. While the number of beds, the denominator of the IME rate calculation, increased, thus lowering BIMC's base IME rate, BIMC never-the-less received a substantial increase in its IME reimbursement from Medicare since it was now collecting an IME add-on for discharges occurring at the Satellite Hospitals, which had a higher acuity than BIMC's main campus.

34.   In reality, since no Interns, Residents, nor Supervising Physicians visited the Satellite Hospital beds the IME add-ons for the Medicare patients admitted at the Satellite Hospitals is unwarranted and constitutes a fraud on the Government.

### C.   DEFENDANTS' KNOWLEDGE THAT THE ADD-ON PAYMENTS WERE IMPROPER

35.   The Defendants were aware that the receipt of DME and IME teaching add-on expense reimbursements for the Satellite Hospitals' Medicare patient discharges was improper.

36.   Because Defendants were concerned that the error would be identified by Empire, BIMC annually set up a liability on its financial statements for the overpayment of DMEs and IMEs for Medicare patients discharged from the Satellite Hospitals. Defendant Ernst & Young assisted and actively participated in this deception.

37. The liability was initially titled "One Rate Benefit" on BIMC's General Ledger. In or around 1993, the "One Rate Benefit caption was changed due to concern that Empire would raise a question about it.

## FIRST CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1))
### Presenting False Claims for Payment

38. The plaintiff incorporates by reference paragraphs 1 through 37 above as if fully set forth herein.

39. Relator, on behalf of himself and the United States, seeks relief against the Hospital Defendants under Section 3729(a)(1) of the False Claims Act, 31U.S.C.§3729(a)(1).

40. The Hospital Defendants, by and through their officers, agents, supervisors, and employees, knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employer, or agent of the United States, false and fraudulent claims for payment or approval in connection with the submission of BIMC's cost reports, and BIMC's requests for reimbursement under the Medicare program.

41. The Hospital Defendants, by and through their officers, agents, supervisors, and employees, authorized the various officers, agents, supervisors, and employees to take the actions set forth above.

42. The United States paid BIMC under the Medicare program because of the fraudulent conduct of the Hospital Defendants.

43. The United States has been damaged as a result of the Hospital Defendants' violations of the False Claims Act because it paid BIMC, through the Medicare and/or Medicaid program much more than BIMC was owed.

44. By reason of the Hospital Defendants' false claims, the United States has been damaged in the substantial amount to be determined at trial.

## SECOND CLAIM

**Violations of the False Claims Act**
**(31 U.S.C. § 3729 (a)(2))**
**Use of False Statements**

45. The plaintiff incorporates by reference paragraphs 1 through 44 above as if fully set forth herein.

46. Relator, on behalf of himself and the United States, seeks relief against the Hospital Defendants under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. § 3729(a)(2).

47. The Hospital Defendants, by and through their officers, agents, supervisors, and employees, knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, and caused to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the United States in connection with the submission of BIMC's cost reports, and BIMC's requests for reimbursement under the Medicare program.

48. The Hospital Defendants, by and through their officers, agents, supervisors, and employees, authorized the various officers, agents, supervisors, and employees to take the actions set forth above.

49. The United States paid BIMC under the Medicare program because of the fraudulent conduct of the Hospital Defendants.

50. The United States has been damaged as a result of the Hospital Defendants' violations of the False Claims Act because it paid BIMC, through the Medicare program much more than BIMC was owed.

51.   By reason of the Hospital Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(3))
### Use of False Statements

52.   The plaintiff incorporates by reference paragraphs 1 through 51 above as if fully set forth herein.

53.   Relator, on behalf of himself and the United States, seeks relief against all Defendants under Section 3729(a)(3) of the False Claims Act, 31 U.S.C. § 3729(a)(3).

54.   Defendants, by and through their officers, agents, supervisors, and employees, conspired to defraud the Government by getting false or fraudulent claims paid or approved by the United States in connection with the submission of BIMC's cost reports, and BIMC's requests for reimbursement under the Medicare program.

55.   Defendants, by and through their officers, agents, supervisors, and employees, authorized the various officers, agents, supervisors, and employees to take the actions set forth above.

56.   The United States paid BIMC under the Medicare program because of the fraudulent conduct of Defendants.

57.   The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid BIMC, through the Medicare program much more than BIMC was owed.

58.   By reason of BIMC's false claims, the United States has been damaged in a substantial amount to be determined at trial.

## **PRAYER**

59.     Plaintiff, on behalf of himself and the United States, prays for judgment against Defendants as follows:

(a)     That this Court enter judgment against the Hospital Defendants on the First and Second Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2)), for treble the United States' damages, in an amount to be determined at trial, plus a $10,000 penalty for each false claim presented prior to September 29, 1999, and an $11,000 penalty for each false claim presented after September 29, 1999, and the costs of this action, with interest, and the costs to the United State Government for its expenses related to this action;

(b)     That this Court enter judgment against all Defendants on the Third Claim for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(3), for treble the United States' damages, in an amount to be determined at trial, plus a $10,000 penalty for each false claim presented prior to September 29, 1999, and an $11,000 penalty for each false claim presented after September 29, 1999, and the costs of this action, with interest, and the costs to the United State Government for its expenses related to this action;

(c)     That the Relator be awarded all costs incurred, including reasonable attorneys' fees;

(d)     That, in the event the United States Government continues to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

(e)     That, in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty

and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or the settlement;

      (f)    That the Relator be awarded prejudgment interest;

      (g)    That a trial by jury be held on all issues;

      (h)    That the United States Government and the Relator receive all relief, both law and in equity, to which they may reasonably appear entitled.

Dated: New York, New York
      June __, 2006

                              Yours, *etc.*

                              **LAW OFFICE OF DIANE McFADIN**
                              *Attorney for Plaintiff*

             By:    _____
                              Diane McFadin (DM2381)
                              11 Broadway, Suite 715
                              New York, NY 10004
                              646.723.2757