USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/25/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA ex rel.
THOMAS E. COLUCCI,                  :

              Plaintiff,    :    **OPINION**

     - against -                  :    06 Civ. 5033 (DC)

BETH ISRAEL MEDICAL CENTER et al.,  :

             Defendants.   :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**	LAW OFFICE OF DIANE McFADIN
    By:  Diane McFadin, Esq.
11 Broadway, Suite 715
New York, New York  10004
  - and -
WILLA N. FRANCE, Esq.
318 E. 120th Street
New York, New York  10035
  Attorneys for Relator

PROSKAUER ROSE LLP
    By:  Dietrich L. Snell, Esq.
1585 Broadway
New York, New York  10036
    By:  James F. Segroves, Esq.
        Malcolm J. Harkins III, Esq.
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, D.C.  20004-2533
  Attorneys for Defendants

LEV DASSIN, Esq.
Acting United States Attorney for the
  Southern District of New York
    By:  Benjamin H. Torrance, Esq.
        Assistant United States Attorney
86 Chambers Street
New York, New York  10007
  Attorney for the United States

**CHIN, District Judge**

        Thomas Colucci, the relator in this False Claims Act ("FCA") <u>qui</u> <u>tam</u> action, died in January 2008.  The administrator

of his estate, his widow Cleuza Colucci ("Colucci"), moves for substitution as relator under Fed. R. Civ. P. 25(a). Defendants Beth Israel Medical Center ("BIMC"), Morton Hyman, Thomas Hayes, and Robert Naldi oppose the motion. For the reasons that follow, Colucci's motion is granted and she is substituted as relator.

## BACKGROUND

The relevant facts and procedural history are not in dispute.

On June 29, 2006, Thomas Colucci filed the complaint in this action under seal as relator on behalf of the United States. His complaint alleged defendants had violated the FCA by filing incorrect Medicare cost reports that resulted in intentional over-billing. (Compl. ¶ 3). A former independent consultant to BIMC, Thomas Colucci claimed personal knowledge of the events alleged in the complaint. (Id. ¶ 7).

The complaint was unsealed on September 13, 2007, and served on defendants in January 2008. Before defendants had time to respond to the complaint, however, Thomas Colucci died on January 24, 2008. On February 21, 2008, I stayed proceedings until such time as "an executor or administrator has been appointed to Mr. Colucci's estate," at which point the executor or administrator was to "advise the court as to whether he seeks to continue to prosecute this case." (Feb. 21, 2008 Order).

Subsequently, in June 2008, Thomas Colucci's widow notified the Court that she had been appointed administrator of her husband's estate and that she sought substitution as relator

in this action under Fed. R. Civ. P. 25(a). Colucci filed her motion to substitute on July 17, 2008. Defendants filed their opposition on August 1, 2008, and Colucci filed her reply on September 15, 2008. The United States, which has declined to otherwise intervene in the action to date, submitted a statement of interest on September 25, 2008. The United States did not take a position on Colucci's motion to substitute; its statement addressed only the question of whether the FCA is a punitive or remedial statute. Defendants replied to the United States' statement on October 6, 2008.

## DISCUSSION

This case presents an issue of first impression in the Second Circuit: whether a qui tam action under the FCA survives the death of the relator. If the answer is yes, the Court must then determine whether in this case Colucci, as administrator of her husband's estate, may be substituted as relator.

### A. The False Claims Act

The FCA was enacted in 1863 at the height of the Civil War primarily to "combat rampant fraud in Civil War defense contracts." S. Rep. No. 99-345, at 8 (1986), as reprinted in 1986 U.S.C.A.A.N. 5266, 5273. As the Supreme Court has explained, the statute:

> was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices

> for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop the plundering of the public treasury.

United States v. McNinch, 356 U.S. 595, 599 (1958).

Accordingly, the FCA provides that:

> [A]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(7).

The statute reaches not only the actual submission of a false claim, but also the making of a record or statement to obtain payment or approval of a false claim, the possession of property or money used to defraud the Government, illegal purchases from an officer or employee of the Government, and the making of a false record to "conceal, avoid or decrease" a financial obligation to the Government. See 31 U.S.C. § 3729(a)(2)-(7).

1. **Qui Tam Provision**

Under the qui tam provision of the FCA, a private person "may bring a civil action for violations of § 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b). These suits are brought in the name of the United States. Id. The plaintiff, or "relator," must provide the Government with a copy of the complaint and written disclosure of

all material evidence and information.  31 U.S.C. § 3730(b)(2).
The complaint remains under seal for at least 60 days; during
that time the Government decides to either:  (a) proceed with the
action; or (b) notify the court that it declines to take over the
action, leaving the relator with the right to conduct the action.
31 U.S.C. § 3730(b), (c).

>   The relator is entitled to receive a portion of the
damages paid in the action, regardless of whether the Government
proceeds with the action.  31 U.S.C. § 3730(d).  This portion can
range from ten to twenty-five percent of proceeds from the action
or settlement of the claim.  Id.

2. **1986 Amendments**

>   In 1986, in response to the perception that "fraud
permeates generally all Government programs," Congress amended
the FCA in significant respects.  S. Rep. No. 99-345, at 2.
These amendments strengthened the Act by, among other things,
increasing the mandatory civil remedies from double damages to
treble damages and the fines from $2,000 to $5,000-$10,000 for
each violation.  31 U.S.C. § 3729(a)(7).  The amendments also
expanded the rights of qui tam relators and increased their
financial incentives to bring suit under the Act, so as to
"encourage more private enforcement suits."  See S. Rep. No. 99-
345, at 23-24.

B. **Substitution of Parties**

>   Fed. R. Civ. P. 25(a)(1) provides that "[i]f a party
dies and the claim is not extinguished, the court may order

substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative."  Whether a claim survives or is "extinguished" upon the death of a party is determined by "the nature of the cause of action for which the suit is brought."  Ex parte Schreiber, 110 U.S. 76, 80 (1884).  Unless a statute directly addresses the issue, courts are generally guided by principles of federal common law, which prescribe that claims characterized as "penal" abate upon a party's death, while claims characterized as "remedial" survive.  See Ex parte Schreiber, 110 U.S. at 80; United States ex rel. Neher v. NEC Corp., 11 F.3d 136, 137 (11th Cir. 1994).

    1.    **Survival of Claim**

        a.    **Applicable Law**

The question whether FCA claims are remedial or punitive remains unsettled; in its most recent decision on the nature of FCA damages, the Supreme Court held that the statute serves dual purposes.  See Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119, 129-35 (2003).  In Chandler, the Supreme Court considered whether municipalities could be liable under the FCA, given their "common law resistance to punitive damages."  Id. at 129.  In permitting municipal liability, the Court backed away from its prior characterization of FCA damages as "punitive," noting that "it is important to realize that treble damages have a compensatory side serving remedial purposes in addition to punitive objectives."  Id. at 130 (distinguishing

- 6 -

<u>Vermont Agency of Nat'l Resources v. United States ex rel. Stevens</u>, 529 U.S. 765 (2000)). It noted that "[w]hile the tipping point between payback and punishment defies general formulation, . . . the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive." <u>Id.</u>

A number of courts have considered the survival of FCA <u>qui</u> <u>tam</u> actions after the death of the relator, but there is no precedent in the Second Circuit on the question. The most recent cases have relied, at least in part, on <u>Chandler</u> to hold that FCA claims are "remedial" and survive the relator's death. See <u>United States ex rel. Wright v. Chevron USA</u>, No. 5:03 Civ. 264 (E.D. Tex. Dec. 30, 2008); <u>United States ex rel. Lemmon v. Envirocare of Utah</u>, No. 2:02 Civ. 904 (BSJ), 2008 U.S. Dist. LEXIS 29619, 6-26 (D. Utah April 9, 2008); <u>United States ex rel. Botnick v. Cathedral Healthcare Sys., Inc.</u>, 352 F. Supp. 2d 530, 532 (D.N.J. 2005). Prior to <u>Chandler</u>, courts also held that FCA <u>qui</u> <u>tam</u> claims were remedial and survived the death of the relator. See <u>NEC</u>, 11 F.3d at 137-39; <u>see also</u> <u>United States ex rel. Semter v. Medical Consultants, Inc.</u>, 170 F.R.D. 490, 496 (W.D. Okla. 1997) ("[T]he relator's role is neither penal nor remedial, but derivative of the remedial claims of the government and thereby survives the death of the relator.").

In the one district court case holding the relator's FCA claim extinguished upon his death, the court noted that the statute's legislative history indicated the FCA was remedial, but that Supreme Court precedent in <u>Stevens</u> suggested the statute was

- 7 -

punitive.  United States ex rel. Harrington v. Sisters of
Providence, 209 F. Supp. 2d 1085, 1086-89 (D. Ore. 2002) (holding
FCA claim did not survive relator's death because, although "FCA
may properly be characterized as remedial, the claim in the
present case contains no allegations of personal or substantial
harm to the relator, only harm to the public interest").  This
decision, of course, pre-dated Chandler.

### b. Application

I agree with the majority of courts that have
considered the question and hold that qui tam actions brought
under the FCA survive the death of the relator.  My reasons are
as follows:  (1) damages for FCA claims, while both punitive and
remedial in nature, serve a primarily remedial purpose; and (2)
the purpose of the FCA is best served by allowing qui tam actions
to survive the death of the relator.

First, damages for FCA claims "have a compensatory
side, serving remedial purposes in addition to punitive
objectives."  Chandler, 538 U.S. at 130.  Chandler makes clear
that the primary purpose of damages under the FCA is to permit
the Government to obtain compensation for fraud inflicted upon
it.  Id. at 129-35.  Indeed, the "most obvious indication" of
remedial purpose is the statute's qui tam feature and the
availability of treble damages, which serve "not to punish, but
to quicken the self-interest of some private plaintiff who can
spot violations and start litigating to compensate the
Government, while benefitting himself as well."  Id. at 131.

Although § 3729(a)(7) provides for civil penalties and treble damages, the Chandler court explained that in qui tam actions, after the relator's reward is subtracted, the remaining damages "provide elements of make-whole recovery beyond mere recoupment of the fraud," such as providing for "prejudgement interest, which is usually thought essential to compensation" but for which the FCA "has no separate provision." Id. It also suggested that treble damages are a "substitute for consequential damages," id. at 131 n.9, and stated that "[t]reble damages certainly do not equate with classic punitive damages," id. at 132. Accordingly, Chandler moved away from the Supreme Court's prior decision in Stevens that the FCA was "essentially punitive" and declined to exclude municipalities from liability under the statute. Id. at 131-32 ("although Stevens recognized that the FCA's treble damages remedy is still 'punitive' in that recovery will exceed full compensation in a good many cases, the force of this punitive nature in arguing against municipal liability is not as robust as if it were a pure penalty in all cases").[1]

---

[1] The parties also dispute whether FCA qui tam actions are remedial or penal under the analysis set forth by the Sixth Circuit in Murphy v. Household Fin. Corp., 560 F.2d 206, 209 (6th Cir. 1977) (considering "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered"). This analysis is less helpful here, however, where there is Supreme Court precedent regarding the nature of FCA damages. Additionally, the Murphy test is difficult to apply in this context, as the Government is the party that suffers the injury under the FCA and also represents the public. I note that most courts that have considered the nature of FCA claims for purposes of determining their survival have found them to be

Second, the statute's purpose and structure support the survival of qui tam actions following the death of the relator. The qui tam provision addresses what Congress deemed "[p]erhaps the most serious problem plaguing effective enforcement" of the FCA: the "lack of resources on the part of the Federal enforcement agencies." S. Rep. No. 99-345 at 7. To overcome this problem, "Congress clearly wanted to remedy this deficiency in the federal enforcement scheme by giving individuals incentives to pursue claims, regardless of the government's involvement, so they might ferret out and litigate claims that the government would not." Semter, 170 F.R.D. 496; see also NEC, 11 F.3d at 139 ("Finally, we believe that the underlying purpose of the FCA will best be served by allowing qui tam actions to survive the death of the relator. One of the FCA's primary purposes is to encourage individuals knowing of government-related fraud to come forward with that information."). A holding that FCA claims were extinguished upon the death of the relator would not further the purpose of the statute -- encouraging private persons to pursue fraud claims on behalf of the Government.

---

remedial under Murphy. See NEC, 11 F.3d at 137-39; Wright, No. 5:03 Civ. 264, at 8 (but holding that Supreme Court's analysis in Chandler controlled outcome); Lemmon, 2008 U.S. Dist. Lexis 29619 at *13 (also emphasizing Chandler); but see Semter, 170 F.R.D. at 495 ("The Murphy analysis presented by the parties and their attempt to categorize the relator result in an artificial attempt to place a square peg into a round hole."). Ultimately, however, I agree with Judge Cauthron in Semter that Murphy provides only limited guidance as to FCA qui tam actions.

The structure of the statute, too, shows how the qui tam provision is used to address injury to the Government and supports survival of the claim. See 31 U.S.C. § 3729(a)(1)-(7). The statute's qui tam provision operates as a "partial assignment" of the Government's legal claims to the relator. Stevens, 528 U.S. at 774 n.4. The Government nevertheless retains substantial rights in any qui tam action. It may choose to intervene at any time "and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). The Government can also dismiss or settle the action "notwithstanding the objections of the person initiating the action." 31 U.S.C. § 3730(c)(2)(A), (B). It also shares in any proceeds recovered by a qui tam relator. 31 U.S.C. § 3730(d).

The relator, then, is "a mechanism of enforcement" by which the Government can recover for its injury. Semter, 170 F.R.D. at 495. Such injury does not vanish with the death of the relator. Id. ("Qui tam is not a cause of action, it is a means of pursuing the government's cause of action."). In fact, the relator's ultimate claim "is not even against the defendants, but against the government for a share of the award." Id.; see also NEC, 11 F.3d at 138-39 ("The defendant's payment under the FCA remains the same regardless of whether the relator decides to file a qui tam action. The relator's recovery is merely a portion of the government's recovery."). Accordingly, "it is entirely consistent with the statutory structure and history of the qui tam provisions of the FCA for the Court to conclude that

the relator's role is neither penal nor remedial, but derivative of the remedial claims of the government and thereby survives the death of the relator." Semter, 170 F.R.D. at 496; see also Joseph E. Hoffer, Qui Tam: Survival of the Action and Fate of the Proceeds Following the Death of the Relator. For the King and For Himself . . . And His Heirs, 37 St. Mary's L.J. 199, 223-237 (2005); Vickie J. Williams, Dead Men Telling Tales: A Policy-Based Proposal For Survivability of Qui Tam Actions Under the Civil False Claims Act, 83 Neb. L. Rev. 1073 (2005).

Defendants present several arguments as to why FCA qui tam actions do not survive the death of the relator, none of which are availing. Many of their arguments seek to establish the punitive nature of qui tam actions under the FCA. As discussed above, however, it is by now established that the statute has a mixed remedial and punitive purpose, and Chandler holds that the punitive nature of FCA damages does not outweigh the statute's compensatory goals. The statute's purpose and its legislative history further support survival of the qui tam action. Cf. Epstein v. Epstein, 966 F. Supp. 260, 260-63 (S.D.N.Y. 1997) (noting "hybrid civil/criminal statute[s] like RICO mix remedial and punitive elements in varying quantities, and the determination that a particular provision or application of civil RICO is 'remedial' or 'punitive' thus inevitably turns on differences of degree rather than kind" before looking at legislative history to see if RICO claims survived plaintiff's death). Accordingly, I hold that FCA claims brought under the

qui tam provision of the statute are not extinguished with the relator's death.

   2.   **Substitution**

       Fed. R. Civ. P. 25(a)(1) provides that substitution may be made when a party dies and "the claim is not extinguished." Defendants argue, however, that with such substitution, Colucci would not have statutory authority to prosecute this action, and the Court would be deprived of subject matter jurisdiction because Colucci is not the "original source" of the allegations underlying the claim, which have already been disclosed to the public through the filing and unsealing of this action. (Defs. Opp'n 6-10 (citing the public disclosure bar of 31 U.S.C. § 3730(e)(4)).

       Defendants' argument fails. Defendants confuse the issues by arguing that Colucci must meet the requirements for relator at § 3730(e)(4), for actions "based upon the public disclosure of allegations or transactions in a . . . civil . . . hearing." Under § 3730(e)(4), actions based on publicly disclosed allegations must be brought by a person who is "an original source" of the information for the Court to exercise subject matter jurisdiction over the claim. Here, however, Thomas Colucci alleged personal knowledge of the events alleged in his complaint (Compl. ¶ 7), and there is no indication that the action was based on publicly disclosed allegations. The action does not become a public disclosure action by virtue of Thomas Colucci's death and Colucci's motion to substitute.

In any event, even assuming § 3730(e)(4) is implicated, its requirements were met, as Thomas Colucci, a person with personal knowledge, brought the action. Colucci need not show that she meets the statutory requirements for relator to be substituted under Fed. R. Civ. P. 25(a)(1). As substitute, she is not litigating on her own behalf but "stands in the shoes of the decedent." Roe v. City of New York, No. 00 Civ. 9062 (RWS), 2003 WL 22715832, at *3 (S.D.N.Y. Nov. 19, 2003) (granting motion to substitute father of class action representative although father could not satisfy the standing requirements to represent class). Defendants do not allege Thomas Colucci failed to meet statutory requirements for relator under the FCA. Accordingly, the substitution of Colucci does not raise jurisdictional problems under the statute.

I next consider the merits of Colucci's motion for leave to be substituted. Courts have discretion to allow substitution under Rule 25(a)(1). The Second Circuit has held that "[a] motion to substitute made within the prescribed time will ordinarily be granted, but under the permissive language of [Rule 25(a)(1)] . . . it may be denied by the court in the exercise of a sound discretion if . . . circumstances have arisen rendering it unfair to allow substitution." Saylor v. Bastedo, 623 F.2d 230, 236 (2d Cir. 1980) (discussing former but substantively identical version of Fed. R. Civ. P. 25(a)(1)).

Here, defendants have not shown that it would be "unfair to allow substitution." Colucci is the administrator of

the relator's estate; accordingly, she is a proper substitute, and she will be substituted under Rule 25(a).

## CONCLUSION

For the foregoing reasons, Colucci's motion to substitute relator is granted. The parties shall appear at a status conference on April 17, 2009, at 11 a.m.

SO ORDERED.

Dated:   New York, New York
         March 24, 2009

DENNY CHIN
United States District Judge