USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x
                                      :
UNITED STATES OF AMERICA <u>ex</u> <u>rel.</u>
CLEUZA COLUCCI,                        :

                    Plaintiff,        :          **<u>OPINION</u>**

              - against -             :          06 Civ. 5033 (DC)

BETH ISRAEL MEDICAL CENTER <u>et al.</u>, :

                    Defendants.       :

- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**   (See last page)

**CHIN, Circuit Judge**

        Qui tam relator Cleuza Colucci ("Colucci") brings this action on behalf of the United States against Beth Israel Medical Center ("BIMC"), Mort Hyman, Tom Hayes, and Robert Naldi under the False Claims Act (the "FCA").  Colucci seeks per-claim penalties and treble damages exceeding $1.5 billion, alleging that defendants submitted false claims to Medicare related to BIMC's Graduate Medical Education program.  Specifically, Colucci alleges that BIMC, a teaching hospital, purchased two non-teaching hospitals to manipulate the factors on which Medicare payments are based, thereby fraudulently inflating BIMC's Medicare reimbursement payments.  Defendants move to dismiss, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, challenging the sufficiency of Colucci's claims.  For the reasons that follow, defendants' motion is granted.

## BACKGROUND

A.   **Prior Proceedings**

The procedural history in this case is recounted in my prior opinion in <u>United States ex rel. Colucci v. Beth Israel Med. Ctr.</u>, 603 F. Supp. 2d 677 (S.D.N.Y. 2009).  Thus, I describe it here only briefly.

In June 2006, Thomas Colucci, a former independent consultant to BIMC, filed his original FCA complaint under seal as a relator on behalf of the United States.  After the United States declined to intervene in September 2007, the complaint was unsealed.

In January 2008, shortly after Thomas Colucci served defendants with process in this action, he died.  In July 2008, Thomas Colucci's widow, Colucci, filed a motion to substitute as relator pursuant to Rule 25(a), presenting an issue of first impression in the Second Circuit as to whether a qui tam FCA suit can survive the death of the relator.  After reviewing the parties' papers and a statement of interest submitted by the United States, I granted Colucci's motion, <u>id.</u> at 684, and later denied defendants' motion to certify an interlocutory appeal, <u>United States ex rel. Colucci v. Beth Israel Med. Ctr.</u>, No. 06 Civ. 5033 (DC), 2009 WL 4809863, at *2 (S.D.N.Y. Dec. 15, 2009).

In March 2010, Colucci filed her First Amended Complaint (the "Complaint"), which defendants now move to dismiss.

B.    **The Medicare System**[1]

        Medicare provides health insurance for disabled persons

and persons over 65.  See 42 U.S.C. § 1395c; Bellevue Hosp. Ctr.

v. Leavitt, 443 F.3d 163, 168 (2d Cir. 2006).  The U.S.

Department of Health and Human Services, Center for Medicare and

Medicaid Services ("CMS"), administers the Medicare program.  Id.

To assist in administering Medicare, CMS contracts with "fiscal

intermediaries," who review and process reimbursement claims

submitted by health care providers.  Conn. Dep't of Soc. Servs.

v. Leavitt, 428 F.3d 138, 142 (2d Cir. 2005).

        Medicare contains four distinct programs, but Colucci's

claims relate only to the first two:  Medicare Parts A and B.

Medicare Part A provides insurance coverage for the costs of in-

patient hospital care, related post-hospital care, home health

services, and hospice care.  Matthews v. Leavitt, 452 F.3d 145,

146 n.1 (2d Cir. 2006); see 42 U.S.C. §§ 1395c to 1395i-5 (Part A

statutory provisions).  Part B is a federally-subsidized,

voluntary health insurance program; it provides supplemental

coverage for medical services excluded from Part A.  Matthews,

452 F.3d at 146 n.1; see 42 U.S.C. §§ 1395j to 1395w-4 (Part B

statutory provisions).

        Prior to 1983, Medicare reimbursed hospitals for Part A

services based upon their actual costs.  Bellevue Hosp. Ctr., 443

---

        [1]    Colucci provides a summary of the Medicare system in
her Complaint.  (See Compl. ¶¶ 20-58).  Her summary is not
materially different from the summary provided herein.

F.3d at 168.  This system changed dramatically in 1983, however, when Congress implemented the Inpatient Prospective Payment System ("IPPS").  See Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65 (1983).  Under IPPS, hospitals are not reimbursed for their actual costs; instead, they are reimbursed under the Diagnostic Related Groups ("DRG") system, under which Medicare pays hospitals an amount reflected in the Medicare DRG reimbursement schedules.  See Bellevue Hosp. Ctr., 443 F.3d at 168; 42 U.S.C. § 1395ww(d).  These schedules pair a Medicare patient's diagnosis with a DRG amount, which is intended to reflect the average cost that an efficiently run provider would incur to treat a patient with the corresponding diagnosis.  See 42 U.S.C. § 1395ww(d)(2)(D).  Thus, under the DRG system, if a hospital's costs exceed the DRG rate, the hospital must absorb the difference; conversely, if a hospital's costs are lower than the DRG rate, the hospital retains the difference.  Huntington Hosp. v. Thompson, 319 F.3d 74, 77 (2d Cir. 2003).

Significantly, costs associated with qualifying Graduate Medical Education ("GME") and school of nursing programs are excepted from the DRG system.  Instead of reimbursing hospitals for GME and school of nursing costs based on the DRG schedule, hospitals are generally reimbursed for these programs on a reasonable-cost basis.  42 U.S.C. § 1395ww(a)(4) (excepting "approved educational activities" from DRG system), § 1395x; see generally Cmty. Care Found. v. Thompson, 318 F.3d 219, 222-23 (D.C. Cir. 2003).

- 4 -

Hospitals receive interim Medicare payments throughout the fiscal year based on their expected entitlement to Medicare reimbursement.  42 C.F.R. § 413.60.  At the end of the fiscal year, each hospital must submit an Institutional Cost Report ("ICR") and audited financial statements to its fiscal intermediary.  42 U.S.C. § 1395g; 42 C.F.R. §§ 413.20, .24. Based on the ICR, Medicare determines whether a hospital is entitled to additional reimbursement or whether the hospital was overpaid and must thus reimburse Medicare.  42 C.F.R. §§ 413.60, .64(f)(1).  In other words, each hospital settles with Medicare at the end of the year, based on information contaned in its ICR.

When submitting an ICR, the provider's administrator or Chief Financial Officer must make the following certification:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified by this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines, and/or imprisonment may result.
>
> . . . .
>
> I hereby certify that I have read the above [certification] statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning _____ and ending _____ and that to the best of my knowledge and belief it is a true, correct, and complete statement

- 5 -

> prepared from the books and records of the
> provider in accordance with applicable
> instructions, except as noted.  I further
> certify that I am familiar with the laws and
> regulations regarding the provision of health
> care services and that the services
> identified in this cost report were provided
> in compliance with such laws and regulations.

United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 237

n.2 (3d Cir. 2004) (quoting Health and Human Services Form HCFA-

2552); see 42 C.F.R. § 413.24(f)(4)(iv).

**B.    The Facts**

The facts alleged in the Complaint are assumed to be

true for purposes of this motion and may be summarized as

follows:

**1.    The Parties**

Colucci, Thomas Colucci's widow, brings this action for

violations of the FCA for herself and the United States.  (Compl.

¶ 5).

Thomas Colucci was a healthcare consultant who advised

hospitals on, inter alia, how to maximize their Medicare and

Medicaid reimbursements and receivables.  (Id. ¶ 6).  From 1997

to 2002, he worked as a consultant for BIMC and its affiliated

hospitals.  (Id.).  Through this consulting work, he became

familiar with their operations and reporting practices.  (Id.).

BIMC is a Manhattan hospital and a subsidiary of

Continuum Health Partners, Inc. ("CHP").  (Id. ¶¶ 8, 11).  BIMC

is a teaching hospital and also has a licensed school of nursing.

(Id. ¶ 8).  In 1992, BIMC acquired Doctors Hospital, a non-

teaching hospital on Manhattan's Upper East Side with approximately 220 patient beds.  (Id. ¶ 9).  It sold Doctors Hospital in 2004.  (Id. ¶ 12).  In 1995, BIMC acquired Kings Highway hospital, a non-teaching hospital with approximately 250 patient beds.  (Id. ¶ 10).  BIMC still owns Kings Highway.  (Id. ¶ 112).  Each hospital functioned under its own operating certificate, and the hospitals did not share staff or equipment. (Id. ¶ 59).

Colucci also asserts claims against Mort Hyman, Tom Hayes, and Robert Naldi (the "individual defendants").  Hyman was the Chairman of the Board at BIMC until mid-2006.  (Id. ¶ 15). Hayes was Chief Financial Officer at BIMC and CHP until approximately 2000.  (Id. ¶ 16).  Until 2001, Naldi was Vice President for Finance and Director of Budget for BIMC and Senior Vice President for Finance at CHP; through these positions, Naldi became fully familiar with BIMC's preparation of its financial statements and ICRs.  (Id. ¶ 18).  The individual defendants were fully familiar with the Medicare and Medicaid statutes and regulations.  (Id. ¶¶ 15, 16, 18).

**2.  Alleged Fraudulent Conduct by Defendants**

Colucci alleges that BIMC purchased Kings Highway and Doctors Hospital (the "satellite hospitals"), and subsequently submitted Medicare reimbursement claims under BIMC's consolidated provider number, to fraudulently inflate its Medicare reimbursement payments:

Prior to BIMC's purchase of Doctors Hospital in 1992, Hayes instructed Donald Modzelewski, BIMC's Vice President for Reimbursement and Budget, to request from Empire, BIMC's fiscal intermediary, a consolidation of BIMC's and Doctors Hospital's provider numbers. (Id. ¶ 60). Modzelewski met with Steve Hartman, a senior Medicare representative at Empire, and informed him, per Hayes's request, that BIMC intended to operate Doctors Hospital as a teaching hospital. (Id.). Hartman did not ask how many residents or interns BIMC intended to employ at Doctors Hospital. (Id.). Hartman approved the consolidation of Doctors Hospital under BIMC's unique provider number, and Doctors Hospital's number was retired. (Id.).

Similarly, prior to BIMC's 1995 purchase of Kings Highway, Hayes instructed Modzelewski to approach Hartman and inform him "that BIMC wanted to do the same thing with Kings Highway that it had done with [Doctors Hospital] about consolidation of provider numbers." (Id. ¶ 61). Hartman again approved the request, and Kings Highway was consolidated under BIMC's unique provider number. (Id. ¶ 61).

Colucci alleges that "[i]t is contrary to the Medicare and Medicaid statutes and regulations to consolidate teaching and non-teaching hospitals as BIMC did with Doctors Hospital and Kings Highway." (Id. ¶ 62). The Complaint does not, however, cite any such statutes or regulations. Colucci further alleges that BIMC purchased the satellite hospitals "with the specific intent of Hyman and Hayes of submitting fraudulent claims by BIMC

to Medicare and realizing improper Medicare Graduate Medical
Education reimbursements to BIMC." (Id. ¶ 64).  Specifically,
the satellite hospitals had higher Medicare Penetration (i.e.,
percentage of patients covered by Medicare) and Medicare Patient
Acuity (i.e., severity of illness of Medicare patients), which
increased BIMC's reimbursement rates once the hospitals were
merged under a single provider number. (Id. ¶ 61).  Prior to
purchasing the satellite hospitals, Hayes or those he supervised
estimated that purchasing the hospitals would result in an
increase in Medicare reimbursement of approximately $20 million
per year per hospital. (Id. ¶ 63).

## **DISCUSSION**

### A.   **12(b)(6) Motion to Dismiss Standard**

To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
First, a court considering a motion to dismiss must accept
plaintiff's factual allegations as true and draw all reasonable
inferences in plaintiff's favor.  See id.; Vietnam Ass'n for
Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d
Cir. 2008).  Second, the court determines whether the allegations
"plausibly give rise to an entitlement to relief." Iqbal, 129 S.
Ct. at 1950.  A plausible claim "pleads factual content that
allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Id.</u> at 1949 (citing <u>Twombly</u>, 550 U.S. at 556).  Dismissal of a complaint under Rule 12(b)(6) is appropriate only if, after drawing all reasonable inferences in plaintiff's favor, the complaint fails to allege facts that give rise to a plausible claim for relief.

**B.   <u>False Claims Act</u>**

Under the qui tam provisions of the FCA, private persons may bring civil actions for violations of § 3729(a).  Qui tam suits are brought in the name of the United States, and the plaintiff, or "relator," must provide the government with a copy of the complaint and written disclosure of all material evidence and information.  31 U.S.C. § 3730(b)(2).  The complaint remains under seal for at least 60 days; during that time the Government decides to either (1) proceed with the action or (2) decline to take over the action, leaving the relator with the right to conduct the action.  31 U.S.C. § 3730(b)(4).  If the prosecution is successful, the relator is entitled to receive some of the proceeds.  31 U.S.C. § 3730(d).

Congress enacted the FCA in 1863 "with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." <u>Vt. Agency of Natural Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 781 (2000) (internal quotation marks and brackets omitted).  The FCA, "then and now," is intended to incentivize private individuals who are aware of a fraud being perpetrated against the government to bring that information forward. <u>United States ex rel. Clausen v. Lab. Corp.</u>

of Am., 290 F.3d 1301, 1307 (11th Cir. 2002) (internal quotation
marks omitted).

Colucci asserts four FCA claims.  In his First, Second,
and Third Claims, Colucci relies on 31 U.S.C. § 3729(a)(1), (2),
and (3) (2006), respectively.  (Compl. §§ 127-47).  Pursuant to §
3729(a), a defendant is liable under the FCA when he

> (1) knowingly presents, or causes to be
> presented, to an officer or employee of the
> United States Government . . . a false or
> fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to
> be made or used, a false record or statement
> to get a false or fraudulent claim paid or
> approved by the Government; [or]

> (3) conspires to defraud the Government
> by getting a false or fraudulent claim
> allowed or paid.

31 U.S.C. § 3729(a)(1)-(3) (2006).

The elements of the above § 3729(a) subsections are as
follows:  Under § 3729(a)(1) -- the basis for Colucci's First
Claim -- a relator must plead that a defendant "(1) made a claim,
(2) to the United States government, (3) that is false or
fraudulent, (4) knowing of its falsity, and (5) seeking payment
from the federal treasury."  United States ex rel. Mikes v.
Straus, 274 F.3d 687, 695 (2d Cir. 2001).  Under § 3729(a)(2) --
the basis for Colucci's Second Claim -- a relator must plead that
a defendant "(1) created, used, or caused to be used, a record or
statement[,] . . . (2) that is false or fraudulent, (3) knowing
of its falsity, (4) to get a false or fraudulent claim paid or
approved by the government."  United States ex rel. Taylor v.

- 11 -

_Gabelli_, 345 F. Supp. 2d 313, 328 (S.D.N.Y. 2004); see _Mikes_, 274 F.3d at 696.  Finally, under § 3729(a)(3) -- the basis for Colucci's Third Claim -- a relator must allege that "[1] the defendant knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and [2] that one or more of the coconspirators performed any act to effect the object of the conspiracy." _United States v. Sforza_, No. 00 Civ. 1307 (AGS), 2000 WL 1818686, at *5 (S.D.N.Y. Dec. 12, 2000); see _Mikes_, 274 F.3d at 696.

Colucci's Fourth Claim relies on the current version of 31 U.S.C. § 3729(a)(1)(B), which is an amended and renumbered version of pre-2009 § 3729(a)(2), the basis for Colucci's Second Claim.  (Compl. ¶¶ 148-52); see Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009); see generally _United States ex rel. Kirk v. Schindler Elevator Corp._, 601 F.3d 94, 113 (2d Cir. 2010) (discussing FERA).  Under § 3729(a)(1)(B), a defendant is liable under the FCA if he "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2006 & Supp. IV 2010).  The amendment to § 3729(a)(2), unlike the amendments to subsections (a)(1) or (a)(3), was made retroactive to all claims for payment pending on or after June 7, 2008.  FERA § 4(f), 123 Stat. at 1625.  Thus, relying on § 3729(a)(1)(B), Colucci seeks damages for "all claims for fraudulent reimbursement by BIMC against Medicare pending on or after 7 June 2008."  (Compl. ¶¶ 148-52).  For purposes of this

motion, FERA did not materially amend pre-2009 § 3729(a)(2).
Compare 31 U.S.C. § 3729(a)(2) (2006) (prohibiting "knowingly"
making or using a false record to get a "false or fraudulent
claim" paid), with 31 U.S.C. § 3729(a)(1)(B) (2006 & Supp. IV
2010) (prohibiting "knowingly" making or using a false record
"material to a false or fraudulent claim").   Thus, the elements
of Colucci's Fourth Claim are essentially the same as those of
his Second Claim, as discussed above.

        Though the elements of Colucci's four causes of action
differ, they all share two elements that are material to the
resolution of defendants' motion.   First, all four causes of
action require a "false or fraudulent" claim.   See Mikes, 274
F.3d at 696.   Second, all four causes of action require that the
defendant's fraudulent conduct be "knowing."   Here, the parties
vigorously dispute (1) whether the claims at issue were "false or
fraudulent" and, if so, (2) whether the defendants acted
"knowingly" in submitting claims, making records, or conspiring
to defraud the government.   In sections C and D below, I discuss
whether Colucci has sufficiently pleaded these two elements with
respect to Colucci's four causes of action.

**C.   False or Fraudulent Claim Under the FCA**

        **1.   Applicable Law**

        A claim is "false or fraudulent" if it "is aimed at
extracting money the government otherwise would not have paid."
Mikes, 274 F.3d at 696 (interpreting § 3729(a)(1) but stating
that the definition "also applies to subdivisions (2) & (3) of 31

U.S.C. § 3729(a)").  The primary dispute in this case is whether Colucci has pleaded that BIMC's Medicare claims were "false or fraudulent."

Courts have recognized three actionable theories of "false or fraudulent" claims:  one "factually false" theory and two "legally false" theories.  <u>United States ex rel. Kirk v. Schindler Elevator Corp.</u>, 601 F.3d 94, 113-14 (2d Cir. 2010); <u>Mikes</u>, 274 F.3d at 696-97; <u>see, e.g.</u>, <u>United States ex rel. Conner v. Salina Reg. Health Ctr., Inc.</u>, 543 F.3d 1211, 1217-18 (10th Cir. 2008).

A claim is factually false where the claimant supplies "[1] an incorrect description of goods or services provided or [2] a request for reimbursement for goods or services never provided."  <u>Mikes</u>, 274 F.3d at 697; <u>see</u> <u>Kirk</u>, 601 F.3d at 114 (defining a factually false claim as one where the claimant "bills for something it did not provide").

There are two cognizable theories of "legally false" FCA liability.  A claim is legally false "where a party certifies compliance with a statute or regulation as a condition to governmental payment."  <u>Mikes</u>, 274 F.3d at 697.  There are two distinct "legally false" theories of liability:  express false certification and implied false certification.  <u>Id.</u>  An express false certification is "a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  <u>Id.</u> at 698.  An implied false certification does not require an express

certification in the submitted claim; instead, the submission of the claim itself constitutes the certification of compliance. Id. at 700.  An implied false certification claim, however, is viable only in "limited circumstances," where "the underlying statute or regulation upon which plaintiff relies expressly states the provider must comply in order to be paid."  Id.  The express-statement requirement prevents the FCA from being used as a "blunt instrument" to enforce compliance with all manner of regulations, even if such regulations are unrelated to the government's payment decisions.  Id. at 699.

### 2.   **Application**

Colucci relies on at least two of the three theories of FCA liability:  the factual falsity theory and the express false certification theory.  (See Pl.'s Mem. in Opp'n 22, ECF No. 53 ("Relator has clearly stated factually false FCA claims.  To the extent that the certifications Defendants did make to Medicare also prove relevant or material, Relator continues to rely on them.")).[2]  Below, I consider whether Colucci has stated an FCA claim under the factual falsity or express false certification theories.  I conclude that she has not.

_____

[2]     Colucci does not seem to argue that her Complaint states an FCA claim under the implied false certification theory. And it does not state such a claim.  For an implied false certification claim to be cognizable, the "statute or regulation upon which plaintiff relies [must] expressly state[]" that compliance is a precondition of payment.  Mikes, 274 F.3d at 700. Here, the Complaint does not point to any statute or regulation that expressly preconditions payment on compliance with a statute or regulation.  Thus, Colucci has not stated an FCA claim under the implied false certification theory.

### a.   Factual Falsity

In opposing defendants' 12(b)(6) motion, Colucci argues that the consolidation of BIMC with the satellite hospitals artificially inflated the factors on which Medicare relies in making reimbursement decisions.  Thus, Colucci argues, when BIMC submitted ICRs based on these inflated factors, it was submitting factually false claims.  Specifically, the Complaint lists four ways by which the consolidation led BIMC to submit factually false claims.

### (i)   Claims for Services to Satellite Hospital Patients

First, Colucci alleges that BIMC submitted claims for reimbursement for patient care at the satellite hospitals under two Medicare payment schemes, rendering its claims factually false.  (Compl. ¶¶ 71-86).

After consolidation, BIMC submitted ICRs seeking compensation for the treatment of satellite-hospital patients via the formula for calculating Direct Medical Education ("DME") costs:  Graduate Medical Education ("GME") costs, which are incurred only at teaching hospitals, are reimbursed outside the DRG system.  (Id. ¶ 71).  DME costs are a component of GME costs; they compensate a hospital for salaries, other personnel expenses, and overhead for Supervising Physicians, Interns, and Residents.  (Id. ¶ 74).  DME reimbursement is calculated by multiplying the Per-Resident Amount[3] by the Medicare Penetration

_____

[3]    The Per-Resident amount was originally calculated in 1984 based on a detailed audit of the hospital's GME program.

- 16 -

rate and then multiplying by total Medicare discharges. (<u>Id.</u> ¶ 75). Purchasing the satellite hospitals did not affect BIMC's Per-Resident Amount. (<u>Id.</u> ¶ 77). The consolidation did, however, increase the number of Medicare discharges because Medicare patients treated at the satellite hospitals were added to BIMC's pre-consolidation Medicare discharges. (<u>Id.</u> ¶ 84). In addition, the consolidation led to an increase in Medicare Penetration, because the pre-consolidation satellite hospitals had a higher percentage of Medicare patients than pre-consolidation BIMC. (<u>Id.</u> ¶ 84). These statistical increases led to an increase in DME. (<u>Id.</u> ¶¶ 78, 84).

In addition, however, post-consolidation BIMC submitted ICRs seeking reimbursement under Medicare Part B for patient care at the satellite hospitals: Patient care at the satellite hospitals -- before and after consolidation -- was provided by house physicians. (<u>Id.</u> ¶¶ 81-82). Because these house physicians are not involved in a GME program, BIMC is reimbursed for their services under Medicare Part B, not the GME reimbursement scheme. (<u>Id.</u> ¶ 82).

In sum, through consolidation, BIMC was able to secure reimbursement for Medicare patients treated at the satellite hospitals under both (1) the DME reimbursement formula and (2) Medicare Part B. (<u>Id.</u> ¶ 85).

---

(Compl. ¶¶ 51-53). Audits are not conducted every year; instead, the 1984 amount is adjusted for inflation. (<u>Id.</u> ¶ 51).

(ii)   **<u>Improper Inflation of Indirect Graduate
Medical Education Costs</u>**

Second, Colucci alleges that the consolidation of Kings
Highway and Doctors Hospital under BIMC's provider number
improperly inflated BIMC's Indirect Graduate Medical Education
("IME") reimbursement.  (<u>Id.</u> ¶¶ 87-92).

Because residents are less experienced than doctors at
non-teaching hospitals, they often have to order procedures or
tests that might be unnecessary at a non-teaching hospital, as
part of the training process.  (<u>Id.</u> ¶ 87).  Medicare's
reimbursement scheme takes this additional expense into account:
teaching hospitals receive IME payments, which are based on a
percentage of total DRG payments.  (<u>Id.</u> ¶ 87-88).

Colucci alleges that the consolidation inflated BIMC's
IME reimbursement in two ways:  First, when the DRG payments to
Kings Highway and Doctors Hospital were added to BIMC's DRG
payments upon consolidation, it resulted in an increased post-
consolidation DRG -- and thus higher IME reimbursement because
IME is a percentage of DRG payments submitted under BIMC's
Provider Number.  (<u>Id.</u> ¶ 90).  Second, because Kings Highway and
Doctors Hospital had higher Medicare Acuities than BIMC, the
consolidation increased BIMC's Medicare Acuity, and thus its DRG
and IME reimbursement.  (<u>Id.</u> ¶ 91).

In sum, Colucci alleges that BIMC received higher IME
reimbursements, which only teaching hospitals are entitled to,

based on the characteristics of the satellite hospitals, which are not teaching hospitals.

### (iii) __Inflation of School of Nursing Reimbursements__

Third, Colucci alleges that BIMC submitted factually false reimbursement claims because school of nursing costs were improperly inflated by the consolidation.  (Id. ¶¶ 109-14).

BIMC has long had a school of nursing; the satellite hospitals did not.  (Id. ¶¶ 109, 113).  School of nursing costs, like GME costs, are reimbursed outside the DRG system.  (Id. ¶ 110).  To determine the appropriate reimbursement amount for school of nursing costs, Medicare multiplies actual school of nursing costs by Medicare Penetration.  (Id.).  Because the pre-consolidation Medicare Penetration of the satellite hospitals was higher than BIMC's pre-consolidation Medicare Penetration, the consolidation increased BIMC's Medicare Penetration.  (Id. ¶ 111).  This increase in BIMC's Medicare Penetration led to an increase in BIMC's school of nursing reimbursement.  (Id.).

In sum, Colucci alleges that BIMC received increased school of nursing reimbursements, which only hospitals with schools of nursing are entitled to, based on the characteristics of the satellite hospitals, which do not have schools of nursing.

### (iv) __Inflation in Outpatient Part B Reimbursement__

Fourth, Colucci alleges that the consolidation increased BIMC's Part B reimbursement.  (Id. ¶¶ 115-22).

Outpatient services are reimbursed on a reasonable cost basis.  (Id. ¶ 116).  To determine the reasonable cost, the Ratio of Costs to Charges ("RCC") for a functional department (e.g., Emergency Room) is multiplied by the actual charge for the service provided.  (Id.).  The RCC is the ratio of total costs within a functional department to total charges within a functional department.  (Id.).

Colucci alleges that the consolidation had the following effect:  "[T]he significantly higher costs at BIMC, a teaching hospital, artificially inflated the [RCC] numerator.  Likewise the consolidated charges, in the denominator, decreased because of the overall lower charges at the Satellite Hospitals. . . . This also increased the RCC, [resulting in] a significant overpayment by Medicare Part B."  (Id. ¶¶ 117-18).

### (v)  <u>Analysis of Factual Falsity</u>

In sum, Colucci alleges that acquiring the satellite hospitals and consolidating them under BIMC's provider number allowed BIMC to bill Medicare at higher rates.  When BIMC acquired Doctors Hospital and Kings Highway, the hospitals' operations remained completely separate.  They did not share doctors, hospital staff, or facilities; indeed, they maintained separate boards of directors and administrative staff.  (Id. ¶ 59).  The consolidation does not seem, according to the Complaint, to have increased the operating efficiencies of the hospital.  More importantly, the consolidation did not result in

the provision to Medicare patients of any additional medical services, or a reduction in the cost of providing such services.

Despite the lack of increased operating efficiencies or services to Medicare patients, the consolidation increased Medicare reimbursements substantially.  Colucci alleges that as a result of the consolidation, Medicare paid BIMC more than $500 million in additional reimbursement over a number of years.  (Id. ¶¶ 133, 140, 147, 152).  This substantial increase in revenue apparently was not tied to any increase in services provided to Medicare patients.

Colucci does not, however, allege that BIMC submitted the typical type of factually false claim.  As the Second Circuit stated in Mikes, a claim is factually false where it supplies "[1] an incorrect description of goods or services provided or [2] a request for reimbursement for goods or services never provided."  274 F.3d at 697.  Here, Colucci does not allege that BIMC incorrectly described the services provided to Medicare patients; she does not allege, for example, that BIMC submitted a claim for cardiac bypass surgery when only an EKG was performed. Nor does Colucci allege that BIMC submitted claims for services rendered to fictitious patients.

Instead, Colucci's quarrel appears to be with the rates used by BIMC in its claimed reimbursements, not the factual basis for those claims.  Colucci's Complaint asserts that BIMC's post-consolidation submission of claims violated "cost-based" Medicare reimbursement principles.  Critically, however, Colucci fails to

point to any statute or regulation that BIMC violated by its
post-consolidation submission of claims.  To the contrary, she
concedes that "[t]here are no regulations covering the
circumstances of consolidating a teaching and non-teaching
hospital."  (Id. ¶ 66).  Colucci fails to identify any
regulations addressing billing under a consolidated provider
number by an entity that includes both teaching and non-teaching
components.  While Colucci repeatedly states that BIMC's actions
violate "Medicare . . . statutes and regulations," she fails to
identify any such regulations.  (Id. ¶ 62; see, e.g., id. ¶¶ 66,
86, 92, 119).

        Hence, there is some uncertainty as to whether BIMC's
consolidation and subsequent submission of claims was permissible
under Medicare.  The worst that can be said of BIMC is that it
took advantage of the uncertainty in the regulations to maximize
its Medicare billings.  This is not fraud.

        The Third Circuit's decision in United States ex rel.
Quinn v. Omnicare Inc. is instructive here.  382 F.3d 432 (3d
Cir. 2004).  There, a qui tam relator sued a pharmacy, alleging
that the pharmacy violated the FCA by crediting Medicaid back
only 50% of the original reimbursement when medications were
returned to the pharmacy by a Medicaid patient.  Id. at 434-35.
The court found that the Medicaid regulations did not "instruct
pharmacies on how to credit or adjust a claim for medications
after those medications have been returned for recycling."  Id.
at 437.  Although it found "the lack of legal authority" on

crediting Medicare for returned medication "disturbing," the court held that it could not impose FCA liability "in light of the absence of a clear obligation to credit Medicaid . . . at a specific rate."[4]  Id. at 434, 445.  This reasoning is persuasive, and it applies here with equal force.

In the absence of any statute or regulation prohibiting the consolidation of the satellite hospitals under BIMC's provider number, Colucci relies on the general argument that "Medicare is a cost-based reimbursement program," and contends that this principle can be "found in 42 CFR § 413 and otherwise throughout the Medicare regulations." (Pl.'s Mem. in Opp'n 3, ECF No. 53).  Part 413 of Title 42, however, spans 139 pages of the Code of Federal Regulations, see 42 C.F.R. §§ 413.1-.355, and Colucci points to no specific provision to support her claim that providers can only be reimbursed for their actual costs.

In fact, the Medicare regulations belie this assertion. For example, under IPPS, providers are reimbursed according to the DRG schedule, see Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163, 168 (2d Cir. 2006); 42 U.S.C. § 1395ww(d), and if a hospital's actual costs are lower than the DRG rate, the hospital retains the difference, Huntington Hosp. v. Thompson, 319 F.3d

---

[4]     The Quinn court's analysis involved the relator's claim under 31 U.S.C. § 3729(A)(7) of the FCA, which imposes liability on any person who "'knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.'"  Quinn, 382 F.3d at 444 (quoting 31 U.S.C. § 3729(A)(7)).  As here, however, § 3729(A)(7) requires that the record or statement be "false."

74, 77 (2d Cir. 2003).  Thus, while the Medicare regulations seek to imitate actual costs, they do not purport to track actual costs perfectly.

Simply put, Colucci has alleged nothing more than that BIMC took steps to maximize its Medicare reimbursements, pursuant to Medicare statutes and regulations.  Thus, Colucci has failed to state a claim under the factual falsity theory of FCA liability.

### b.   Express False Certification

Though Colucci primarily relies on factual falsity as the basis for FCA liability, she also relies on express false certification.  (See Pl.'s Mem. in Opp'n 22, ECF No. 53 ("To the extent that the certifications Defendants did make to Medicare also prove relevant or material, Relator [relies] on them.")).

"[N]ot every instance in which a false representation of compliance with a regulatory regime is made will lead to liability."  United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 114 (2d Cir. 2010).  Under Mikes, a claim is expressly false where it "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  274 F.3d at 698 (emphasis added).  General certifications of compliance with the law are insufficient.  United States ex rel. Conner v. Salina Reg. Health Ctr., Inc., 543 F.3d 1211, 1218-19 (10th Cir. 2008) (holding that certification stating that "the services identified in this cost report were provided in compliance with the [the

laws and regulations regarding the provision of health care services]" was too general to support an implied false certification claim).

Here, Colucci relies on the following ICR language:  "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."  (Compl. ¶ 36).  As in <u>Conner</u>, this certification "represents the provider's assurance that it continues to comply with the requirements of Medicare participation," and does not represent a precondition to payment.  <u>Conner</u>, 453 F.3d at 1218-19.  In addition, it does not certify compliance with a "particular" statute.  <u>See</u> <u>Mikes</u>, 274 F.3d at 698.  Thus, even if Colucci had identified a statutory or regulatory violation by BIMC, the certification she identifies would be too general to support FCA liability on an express false certification theory.

For the foregoing reasons, Colucci has failed to state a "false or fraudulent" claim under the FCA.  Thus, because a "false or fraudulent" claim is a necessary element to all four of Colucci's FCA causes of action, Colucci has failed to state a claim under the FCA.

D.   **"Knowing" Conduct Under the FCA**

1.   **Applicable Law**

As discussed above, all four of Colucci's causes of action require "knowing" conduct.  Section 3729(a)(1) requires

that a defendant "knowingly present[]" a false claim to the U.S.
government.  31 U.S.C. § 3729(a)(1) (2006).  Sections 3729(a)(2)
and 3729(a)(1)(B) require that a defendant "knowingly" make or
use a false record or statement.  31 U.S.C. § 3729(a)(1)(B) (2006
& Supp. IV 2010); 31 U.S.C. § 3729(a)(2) (2006).  And §
3729(a)(3) requires a defendant to "knowingly conspire" to obtain
payment or allowance of a false or fraudulent claim.  <u>United
States v. Sforza</u>, No. 00 Civ. 1307 (AGS), 2000 WL 1818686, at *5
(S.D.N.Y. Dec. 12, 2000); <u>see</u> 31 U.S.C. § 3729(a)(3) (2006).

> The FCA defines "knowing" as follows:
>
> (b) Knowing and Knowingly Defined. -- For
> purposes of this section, the terms "knowing"
> and "knowingly" mean that a person, with
> respect to information--
>
>> (1) has actual knowledge of the
>> information;
>> (2) acts in deliberate ignorance of the
>> truth or falsity of the information; or
>> (3) acts in reckless disregard of the
>> truth or falsity of the information,
>
> and no proof of specific intent to defraud is
> required.

31 U.S.C. § 3729(b) (2006); <u>accord</u> 31 U.S.C. § 3729(b)(1) (2006 &
Supp. IV 2010).

### 2.  <u>Application</u>

For the reasons discussed above, the Complaint fails to
plausibly allege that defendants "knowingly" presented a false
claim, within the meaning of the FCA.  Colucci has failed to
allege circumstances showing that defendants knew or should have
known that it was illegal for them to bill as they did for
services provided by teaching and non-teaching hospitals under a

consolidated provider number.  Again, Colucci concedes that no
regulations cover the circumstances of consolidating a teaching
and non-teaching hospital.  (Compl. ¶ 66).  It is simply not
plausible, then, that defendants knew or should have known they
were submitting claims that were false.

Even assuming the claims submitted by BIMC were
"false," given the lack of clarity in the law, it cannot be said
that defendants "knew" the claims were false.  In the absence of
a clear obligation on the part of BIMC to bill for each component
separately, FCA liability is not appropriate, for the FCA is
intended to punish only "wrongdoing," not honest mistakes.  <u>Wang
v. FMC Corp.</u>, 975 F.2d 1412, 1419 (9th Cir. 1992) (internal
quotation marks omitted).  Where a relator alleges that a
claimant's interpretation of an ambiguous regulation renders its
claims false under the FCA, falsity is evaluated by examining
whether the interpretation is <u>correct</u> in light of applicable law;
but whether a claimant acted knowingly in submitting a false
claim turns on "the <u>reasonableness</u> of [the claimant's]
interpretation."  Fabrikant et al., <u>Health Care Fraud:  Criminal,
Civil and Administrative Law</u> § 4.01 (2011) (emphasis added)
(citing <u>United States ex rel. Hefner v. Hackensack Univ. Med.
Ctr.</u>, 495 F.3d 103, 109 (3d Cir. 2007); <u>Minn. Assoc. of Nurse
Anesthetists v. Allina Health Sys. Corp.</u>, 276 F.3d 1032, 1052
(8th Cir. 2002); <u>United States ex rel. Oliver v. Parsons Co.</u>, 195
F.3d 457, 460 (9th Cir. 1999)).  Colucci's inability to identify
any regulation violated by defendants demonstrates that

defendants' interpretation of the Medicare regulations was not unreasonable, and thus not knowingly false or fraudulent.

The Complaint offers some specifics for the inference that defendants acted knowingly. It alleges that: (1) Hayes worked with auditors at Ernst & Young to establish a special "rate account" as a repository for the proceeds of the fraud, and later changed the name of the account "in order not to arouse Empire's suspicion of any wrongdoing"; (2) "Defendant Hyman knew of the fraud because he regularly reviewed the rate account and knew that it reserved the amounts of Medicare's reimbursement for BIMC's GME claims"; (3) "Defendant Hayes also knew of the fraud because he instructed that the reserve [account] for the Medicare GME payments be established to conceal the fraud"; (4) "Defendant Naldi knew of the fraud because he was in charge of the general accounts and financial statements"; and (5) "[s]ince all three Defendants had extensive backgrounds in healthcare and the Medicare and Medicaid systems, it was impossible for any or all of them not to know of the fraud being perpetrated on Medicare." (Compl. ¶¶ 93-98, 105-08).

These facts, however, are insufficient to give rise to a plausible inference that defendants knowingly submitted false claims. As the Supreme Court stated in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" 129 S. Ct. at 1950 (emphasis added) (quoting Fed. R. Civ. P.

8(a)(2)).  Here, Colucci essentially avers that because three knowledgeable executives at a hospital were familiar with the hospital's accounts and reviewed its financial statements, they must have known that the hospital was submitting false claims. Again, however, given the lack of clarity in the regulations, these facts show only that defendants took advantage of a lack of clarity in the regulations to maximize BIMC's reimbursements.  At worst, these alleged facts create only a "mere possibility" that defendants acted knowingly and are insufficient to plead the "knowing" conduct element of Colucci's FCA claims.

In sum, Colucci has not alleged facts to support an inference that defendants committed the kind of knowing "wrongdoing" that the FCA is intended to remedy.  Thus, in addition to failing to allege falsity, the Complaint fails to allege "knowing" conduct.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.  The Clerk of the Court shall enter judgment dismissing the amended complaint, with prejudice.  The case shall be closed.

SO ORDERED.

Dated:   New York, New York
         March 31, 2011

_____
DENNY CHIN
United States Circuit Judge
Sitting By Designation

- 29 -

**APPEARANCES:**

For Relator:
        LAW OFFICE OF DIANE McFADIN
            By:  Diane McFadin, Esq.
        11 Broadway, Suite 715
        New York, New York  10004
            - and -
        WILLA N. FRANCE, Esq.
        318 E. 120th Street
        New York, New York  10035

For Defendants:
        PROSKAUER ROSE LLP
            By:  Malcolm J. Harkins III, Esq.
                James F. Segroves, Esq.
        1001 Pennsylvania Avenue, NW
        Suite 400 South
        Washington D.C.  20004-2533
            By:  Edward S. Kornreich, Esq.
                Roger A. Cohen, Esq.
        1585 Broadway
        New York, New York  10036